1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   CHARLEY McMURTRY,                        No.  2:12-cv-00103 JAM DB P

12              Plaintiff,

13        v.                                  ORDER AND

14   HU, et al.,                              FINDINGS AND RECOMMENDATIONS

15              Defendants.

16

17        Plaintiff is a state prisoner proceeding pro se and in forma pauperis in this civil rights

18   action filed pursuant to 42 U.S.C. § 1983. This matter proceeds on plaintiff's original complaint

19   against defendants Gebrezghi and Hu on Eighth Amendment claims. Pending before the court is

20   defendants' August 21, 2015, motion for summary judgment, which plaintiff opposes. For the

21   reasons set forth below, the undersigned will recommend that defendants' motion be granted.

22   **I.       Relevant Procedural Background**

23        Plaintiff initiated this action on January 12, 2012. His complaint was screened on

24   December 20, 2012, and found to state Eighth Amendment claims against the defendant. Service

25   was ordered, and defendants filed an answer on July 24, 2013.

26        On August 6, 2013, a discovery and scheduling order issued setting the discovery deadline

27   for November 22, 2013, and the dispositive motion deadline for February 14, 2014. (ECF No.

28   24.)

1   On February 10, 2014, defendants moved to dismiss for failure to exhaust administrative

2   remedies.[1] (ECF No. 32.) In light of this motion, the dispositive motion deadline was extended to

3   45 days following ruling on defendants' motion. (ECF No. 34.)

4   On July 9, 2015, defendants' motion was denied (see ECF Nos. 49, 51), and the instant

5   motion for summary judgment soon followed. It is now fully briefed and ready for disposition.

6   Also pending is plaintiff's request to continue consideration of defendants' motion for

7   summary judgment pending additional discovery. (ECF No. 56.) Defendants oppose this request.

8   (ECF No. 59.)

9   **II.      Plaintiff's Allegations**

10   Plaintiff alleges that defendants violated his rights under the Eighth Amendment while he

11   was incarcerated at California State Prison-Solano ("CSP-Solano") by taking the following

12   actions:

13   •      On or about June 5, 2010, at a time when plaintiff was held in five-point restraints,

14   defendant Nurse Gebrezghi twice injected plaintiff with drugs.  Plaintiff had informed

15   Nurse Gebrezghi of his phobia of needles; moreover, the drugs could have been orally

16   administered.  (ECF No. 1 at 5, 7, 9.)

17   •      On or about June 9, 2010, plaintiff was placed in a safety cell (also known as a "rubber

18   room").  After plaintiff complained about a lack of ventilation in the safety cell, a

19   correctional officer placed a fan in front of the cell, which allowed air to enter through

20   a crack at the bottom of the cell door.  Less than 30 minutes later, defendant Nurse Hu

21   stated to plaintiff, "We don't like you!  You don't get a fan!  Besides, other inmates

22   will beg for one too!" and removed the fan.  Plaintiff's nose started to bleed, and he

23   "suffered in extremely harsh conditions" for twenty-four hours before a correctional

24   officer placed the fan back in front of the cell. (Id. at 10.)

25   •      On or about June 11, 2010, Nurse Hu placed plaintiff's arm in a restraint. When he

26

27   ---
[1] This motion was later converted to a motion for summary judgment pursuant to Albino v. Baca,
747 F.3d 1162 (9th Cir. 2014). (See ECF No. 39.)

28

2

told her it was too tight, she replied, "I wish they [would] put you in a gas chamber so I won't have to bother with you anymore!" She then began to repeatedly express a wish that she could kill plaintiff. (Id. at 11.)

## III.   Plaintiff's Motion to Continue

Plaintiff moves for a continuance on defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure "56(f)" pending additional discovery.

The court construes plaintiff's motion as one for relief pursuant to Federal Rule of Civil Procedure 56(d).[2] Under that rule, a party opposing a motion for summary judgment to request an order deferring the time to respond to the motion and permitting that party to conduct additional discovery upon an adequate factual showing. See Fed. R. Civ. P. 56(d) (requiring party making such request to show "by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition."). A Rule 56(d) affidavit must identify "the specific facts that further discovery would reveal, and explain why those facts would preclude summary judgment." Tatum v. City and County of San Francisco, 441 F.3d 1090, 1100 (9th Cir. 2006). On such a showing, "the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d).

"Though the conduct of discovery is generally left to a district court's discretion, summary judgment is disfavored where relevant evidence remains to be discovered, particularly in cases involving confined pro se plaintiffs." Klingele v. Eikenberry, 849 F.2d 409, 412 (9th Cir. 1988). Thus, summary judgment in the face of requests for additional discovery is appropriate only where such discovery would be "fruitless" with respect to the proof of a viable claim." Jones v. Blanas, 393 F.3d 918, 930 (9th Cir. 2004). "The burden is on the nonmoving party, however, to show what material facts would be discovered that would preclude summary judgment." Klingele, 849 F.2d at 412; see also Conkle v. Jeong, 73 F.3d 909, 914 (9th Cir. 1995) ("The

---

[2] Federal Rule of Civil Procedure 56(f) does not provide the relief that plaintiff seeks. Rather, it grants the court authority to enter judgment independent of the motion for a nonmovant, on grounds not raised by a party, or to consider summary judgment on its own after identifying for the parties material facts that may be genuinely in dispute.

3

burden is on the party seeking to conduct additional discovery to put forth sufficient facts to show that the evidence sought exists."). Moreover, "'[t]he district court does not abuse its discretion by denying further discovery if the movant has failed diligently to pursue discovery in the past.'" Conkle, 73 F.3d at 914 (quoting California Union Ins. Co. v. American Diversified Sav. Bank, 914 F.2d 1271, 1278 (9th Cir. 1990).

Plaintiff has not met his burden under Rule 56(d). Plaintiff's motion does not identify which documents he seeks or how those documents would assist him in opposing defendants' motion. In his opposition to defendants' motion, plaintiff claims that maintenance logs related to the air conditioning unit and reports by an unidentified correctional officer purportedly a witness to Nurse Hu's conduct will help him defeat defendants' motion. Plaintiff does not explain, however, why these records were not and could not have been obtained through the normal course of discovery, which ended three years ago. Conkle, 73 F.3d at 914. During that open period of discovery, plaintiff filed a single motion to compel wherein he challenged the propriety of defendants' responses to his discovery requests. He failed, though, to identify which responses were improper and why, and the motion was ultimately denied for this lack of specificity. (See ECF No. 38.) Plaintiff's motion here will therefore be denied for his failure to act diligently.

## IV.   Undisputed Facts[3]

At all times relevant to this action, plaintiff was an inmate incarcerated at CSP-Solano. Defendants are Registered Nurse ("RN") S. Gebrezghi, the Supervising Registered Nurse II, and RN K. Hu. Defs.' Statement Undisputed Facts ("DSUF") (ECF No. 52-3) ¶¶ 3-4.

### A.   CSP-Solano Mental Health Care Guidelines

The California Department of Corrections and Rehabilitation ("CDCR") maintains comprehensive medical and mental health records for every inmate in its custody, commonly referred to as a Unit Health Record ("UHR"). DSUF ¶ 5. Encounters between institutional medical and mental staff and inmate-patients are recorded and maintained in the UHR. Id. Staff are trained to chart or document all inmate-patient interactions meticulously, no matter how

---

[3] All facts are undisputed unless noted otherwise.

4

minor. Id. Mental health records are part of an inmate's UHR, but are maintained separately from medical or dental records. Id.

Inmates who are diagnosed with a serious mental illness are provided mental health services through CDCR's Mental Health Services Delivery System ("MHSDS"). DSUF ¶ 6. It is designed to provide appropriate levels of treatment and to promote individual functioning within the least-restrictive clinical environment, consistent with the safety and security needs of the inmate-patient and the institution. Id. Mental health care is provided by a variety of mental health professionals, including Clinical Social Workers, Psychologists, and Psychiatrists. Id.

The most restrictive level of mental health care within a CDCR institution is a Mental Health Crisis Bed ("MHCB"). DSUF ¶ 7. The MHCB provides short-term (ordinarily ten days or less) inpatient treatment to inmate-patients who exhibit significant impairment and dysfunction, require 24-hour nursing care, and present a danger to themselves or others. MHCB inmates are monitored daily by their primary clinician. Id. They meet with their Interdisciplinary Treatment Team ("IDTT") at least once a week, are evaluated by a psychiatrist at least twice a week, and receive 24-hour nursing care and intensive therapy and rehabilitation as needed. Id.

In the clinical judgment of a physician that an emergency situation exists, medication may be forcibly administered to an inmate-patient over the inmate-patient's objection. DSUF ¶ 8. An emergency exists when there is a sudden, marked change in an inmate-patient's condition so that action is immediately necessary for the preservation of life, to prevent serious bodily harm to the inmate or others, and it is impracticable to first obtain consent. Id. In such circumstances, only medication that is required to treat the emergency condition is provided, and in ways that are least restrictive of the personal liberty of the inmate.[4] Id.

When staff discovers inmates harming themselves, medical assistance is summoned

---

[4] Plaintiff disputes many of defendants' medical and administrative facts with citation to only his own statements. Since plaintiff is not qualified as an expert witness and in the absence of any evidentiary basis for these objections, they will be disregarded. See Fed. R. Evid. 702. Plaintiff also disputes other ancillary facts that are immaterial to the resolution of the instant motion. Those disputes will be noted but ultimately disregarded. Lastly, plaintiff raises disputes that concern the conduct of non-parties and/or the conduct of the defendants that were found to not state a claim per the December 20, 2012, Screening Order; these, too, will be disregarded.

immediately to provide emergency medical care. DSUF ¶ 9. These events are taken very seriously and are considered emergency situations. Id. Nursing staff are expected to carry out orders from physicians during emergency situations. Id. ¶ 10.

Staff members are trained to monitor and record any changes in an inmate-patient's environment that may pose a risk to their health or well-being. DSUF ¶ 11. This includes the cell temperature and any non-functioning equipment. Id.

The CSP-Solano Correctional Treatment Center ("CTC") is cooled by a centralized air conditioning system that blows cool air throughout the building. DSUF ¶ 12. Staff members regularly check and record cell temperatures. Id. If equipment is not properly working, or a cell is unsafe to house an inmate-patient, staff members may "redline" that cell. Id. This process consists of notifying custody staff and building maintenance officials that a cell is not available to house an inmate. Id. The inmate-patient is then escorted out of their cell to another cell that is in proper condition. Id.

When an inmate is restrained, CDCR nurses are trained to monitor each extremity every fifteen minutes in order to ensure adequate circulation. DSUF ¶ 13. A registered nurse also conducts hourly assessments of the inmate-patient during the entire period of restraint. Id. The hourly assessments document current physical, mental, and behavioral status of the inmate-patient, any indicated interventions performed, and the inmate-patient's readiness for release from restraints. Id. The assessment also includes an overall summary of the inmate-patient's physical condition, general behavior, and response to counseling / interviews. Id.

Safety cells are those that are designed to be free from hazardous objects or fixtures; have adequate light and ventilation; are maintained at an appropriate temperature; have secure, lockable doors; and have windows that permit visual observation of the inmate-patient by staff. DSUF ¶ 14.

**B.     Plaintiff's Relevant Mental Health History**

Plaintiff was housed at MCHB in the CSP-Solano CTC between June 3 and 13, 2010, because he had suicidal and homicidal ideations. DSUF ¶¶ 15-16. Dr. Obegi, who participated as a member of plaintiff's IDTT, provided mental health treatment for plaintiff during his stay at the

1   CTC. Id.

2        Dr. Obegi evaluated plaintiff and conducted his CTC intake assessment on June 3, 2010,

3   at approximately 2:30 p.m. DSUF ¶ 16. He documented plaintiff's mental illness as Mood

4   Disorder Not Otherwise Specified ("NOS"), which is a type of disorder that has features of other

5   mental disorders but does not squarely fit into a single discrete category. Id. ¶ 17. Dr. Obegi also

6   documented that plaintiff had features of borderline personality disorder and a sense of

7   entitlement. Id.

8        Features of borderline personality disorder include pervasive patterns of instability

9   of interpersonal relationships, self-image, and marked impulsivity. DSUF ¶ 18. Individuals with

10  this condition may be very sensitive to environmental circumstances. Id.  They may also

11  experience intense abandonment fears and inappropriate anger. Id.

12       Individuals with borderline personality disorder may have a pattern of unstable and

13  intense relationships. They may idealize potential caregivers, but they may also switch quickly

14  from idealizing other people to devaluing them, and feeling that the other person does not care

15  enough or does not give enough. Id. These individuals are prone to sudden and dramatic shifts in

16  their view of others, who may alternatively be seen as beneficent supports or as cruelly punitive.

17  Id. Persons with this disorder may express inappropriate and intense anger or have difficulty

18  controlling their anger. Id.

19       Persons with this disorder may also display reoccurring impulsive acts of self-damaging

20  and self-injurious behavior (such as cutting or burning themselves) that frequently include an

21  intent to die. DSUF ¶ 19. Suicide attempts and threats from individuals with borderline

22  personality disorder are very common. DSUF ¶ 20.

23       Plaintiff's exhibition of these features was documented during his stay at the CSP-

24  Solano CTC. DSUF ¶ 21. These features materialized during his episodes of intense anger at

25  nursing staff, apparently triggered by perceived slights, followed by periods of relative calm.  Id.

26  They were also demonstrated by his impulsive self-injurious behavior and his report of recent

27  preparations to kill himself, as well as his threats to harm staff. Id.

28  ////

7

C.      Events Involving Nurse Gebrezghi

During the evening of June 4, 2010, nursing staff observed plaintiff attempting to use the edge of a plastic container to cut his right forearm. DSUF ¶ 22. A nurse asked him to stop and called for help. Id. ¶ 23. Plaintiff did stop but then covered his upper body and arm with a blanket. Id. ¶ 24. Nursing staff then asked plaintiff to cooperate and submit to handcuffs so he could be safely brought out of his cell. Id. ¶ 25. Plaintiff refused and instead placed his mattress against the cell door, covering it so staff could not see into the cell. Id. ¶ 26. The Watch Commander and Sergeant approached plaintiff's cell and convinced him to remove the mattress and comply with being handcuffed. Id. ¶ 27. Plaintiff was then escorted out of his cell to receive treatment. Id.

Within minutes, Dr. Kumar, a Staff Psychiatrist, ordered plaintiff to be secured in five-point restraints for four hours to prevent plaintiff from inflicting further self-harm or from harming others. DSUF ¶ 28. Dr. Kumar ordered nursing checks to be conducted every fifteen minutes. Id. Dr. Kumar also ordered that the restraints could be gradually loosened if plaintiff agreed not to harm himself. Id. Dr. Kumar noted that plaintiff had a history of poor impulse control. Id. Dr. Kumar then ordered staff to follow all nursing protocols relative to plaintiff's medications, fluids, toileting, range of motion, and vital signs. Id.

The medical notes indicate that plaintiff cooperated but with hesitation and visible anger, saying, "do not give me a shot." DSUF ¶¶ 29-30. Nursing staff asked plaintiff to cooperate and submit himself to a restraint bed, which plaintiff did with slight resistance. Id. ¶ 31. Plaintiff threatened to harm any nursing staff who tried to give him an injection; he was loud and argumentative. Id. ¶ 33. After plaintiff was secured in restraints, he tried to release himself. Id. ¶ 34. He then appeared angry, volatile, had an intense look, and had veins popping out of his neck and arm. Id. ¶ 35. Plaintiff continued to say that if he was given a shot he would hurt staff. Id.

During this time, Dr. Kumar ordered 20 mg of Geodon, an antipsychotic medication, and 20 mg of Ativan, a sedative, to be administered by intramuscular injection. DSUF ¶ 36. Around 7:20 p.m., Dr. Kumar came to plaintiff with the Watch Commander, talked to him, and discussed his situation. Id. ¶ 37. Defendants contend that plaintiff agreed to be given an injection but

8

1    wanted another nurse to administer it. Id. ¶ 38. Plaintiff has no recollection of agreeing to an

2    injection; instead, he was screaming and crying not to be injected. Pl.'s Resp. to DSUF ¶ 38 (ECF

3    No. 57).

4         Around this time, Defendant Nurse Gebrezghi appeared and administered Dr. Kumar's

5    ordered injections into plaintiff's left thigh. DSUF ¶ 39. This is the only instance in which Nurse

6    Gebrezghi administered an involuntary intramuscular injection for plaintiff during his stay at the

7    CSP-Solano CTC between June 3 and 13, 2010. Id. ¶ 40. Plaintiff claims Nurse Gebrezghi

8    administered this shot in retaliation for his threats to staff. Pl.'s Resp. to DSUF ¶ 41.

9         Dr.  Kumar's decision to order intramuscular administration of Geodon and Ativan was

10   reasonable and clinically indicated under the circumstances.[5] DSUF ¶ 41. Plaintiff was required

11   to submit to five-point restraints in order to prevent him from harming himself or others.  Id. He

12   also had recently been observed cutting his arm with a plastic container and was unpredictable.

13   Id. Releasing plaintiff from the restraints to take medication orally would have exposed staff and

14   plaintiff to risk of harm in light of his visible anger and threats to harm staff. Id. The emergency

15   nature of the circumstances made it reasonable for plaintiff to be administered the injections

16   intramuscularly. Id.

17        **D.      Events Involving Nurse Hu**

18        On June 9, 2010, Dr. Shamasundara, a psychiatrist, ordered plaintiff to be placed in a

19   safety cell around 2:45 p.m. DSUF ¶ 42. One-on-one suicide watch was ordered, with checks to

20   be conducted every fifteen minutes. Id. This order was renewed by the attending psychiatrist

21   around every four hours until June 11, 2010, at 2:00 a.m., when plaintiff was again placed in five-

22   point restraints for exhibiting destructive behavior. Id.

23        Following is a timeline of events beginning on June 9, 2010, at 2:45 p.m., when plaintiff's

24   safety cell temperature measured 72 degrees.  DSUF ¶ 44. At that time, plaintiff was sitting up

25   against the door, covered in his blanket. Id. He responded to staff, but refused to remove the

26   _____

27   [5] Plaintiff disputes that these injections were reasonable and necessary, but he fails to submit any
     evidence beyond his own statements. See Pl.'s Resp. to DSUF ¶ 41. Since plaintiff is not
     qualified as an expert witness, there is no dispute as to the reasonableness and necessity of these

28   injections.

blanket from his head. Id. He was not exhibiting behavior indicating he would inflict self-harm. Id. At 5:00 p.m., plaintiff was provided a meal, which he ate. Id. ¶ 45. At 5:20 p.m., he used toilet paper to cover his cell door window and refused to take it down. Id. ¶ 46. He also began swinging his blanket and hitting a camera in the cell. Id. At 5:30 p.m., plaintiff was escorted out of the safety cell and placed in another cell. Id. ¶ 47. He was seen by a psychologist at 5:50 p.m. and returned to the safety cell at 6:30 p.m. Id.

From 7:30 p.m. on June 9, 2010, until 3:00 a.m. on June 10, 2010, plaintiff was quiet, and appeared to be asleep. DSUF ¶ 48. His cell temperature was between 72 and 73 degrees. Id.

On June 10, 2010, at around 3:00 a.m., plaintiff asked for pain medications for his arthritis, and he fell asleep again at 6:00 a.m. DSUF ¶ 49. At 7:00 a.m., plaintiff told nursing staff that he was not suicidal, denied having hallucinations, and promised that he would not hurt anybody that day. Id. ¶ 50. He spoke with staff about returning a tray. Id. His cell temperature was around 73 degrees. Id.

From 9:00 a.m., until 2:05 p.m., plaintiff's cell temperature was between 72 and 75 degrees. DSUF ¶ 51. Defendants claim plaintiff exhibited no signs of being in distress during this time, but plaintiff claims the air conditioning was not working properly and he fainted from lightheadedness due to the lack of ventilation. Id.; Pl.'s Resp. to DSUF ¶ 51. Plaintiff fell asleep from around 2:05 p.m. until around 4:35 p.m. DSUF ¶ 51.

At 4:35 p.m., plaintiff was observed with a tissue containing a small amount of blood in his hand. DSUF ¶ 52. Plaintiff attributed the blood to poor air circulation in his cell, and claimed the bleeding stopped after he blew his nose twice. Id. Nursing notes reflect a portable fan was provided at the door of plaintiff's cell. Id. Plaintiff voiced concern about the air conditioning, claiming it provided him "psychological support." Id. Plaintiff was offered fluids but he declined to drink them. Id.

At 5:00 p.m., plaintiff was standing by his door and calm. DSUF ¶ 53. His cell temperature measured 74 degrees. Id. At 5:36 p.m., plaintiff was still standing by the door. Id. ¶ 54. He claimed that he coughed up red blood. Id. He was seen by Dr. Rallos, a medical doctor, two minutes later at 5:38 p.m. Id. By 6:00 p.m., the observing nurse noted there was no active

10

1  bleeding. Id. ¶ 55. Plaintiff was sitting up, talking, and was given medications orally. Id. He

2  continued to be upset about the air conditioning. Id.

3       At 6:10 p.m., another portable fan was placed at his door, and more fluids were offered.

4  DSUF ¶ 56. Plaintiff then stuck his arms out his cell door food port and refused for it to be

5  closed; plaintiff claims he did this to complain about the lack of air conditioning. Id.; Pl.'s Obj.

6  DSUF ¶ 11. Custody staff arrived to talk to plaintiff, and he continued to bang on the cell door.

7  DSUF ¶ 56. Plaintiff spoke with Dr. Obegi at around 6:37 p.m. DSUF ¶ 57.

8       At 7:00 p.m., plaintiff was yelling intermittently, and he had his arm stuck through the

9  food port. DSUF ¶ 58. Correctional Sergeant responded and ordered plaintiff to remove his arm

10  from the food port and put it back in his cell. Id. ¶ 58. Around this same time, nursing staff

11  reported air conditioning was back in working condition. Id. Plaintiff was cooperative, talking,

12  and smiling for the next several hours. Id. ¶ 59.

13       At 10:00 p.m., plaintiff's cell temperature measured 75 degrees. DSUF ¶ 60. Plaintiff was

14  smiling and pleasant. Id. At 1:00 a.m., on June 11, 2010, plaintiff's cell temperature measured

15  74.5 degrees. Id. ¶ 61.

16       At around 2:50 a.m. on June 11, 2010, plaintiff began peeling rubber off his safety cell

17  walls, biting the wall, putting paper in his mouth, and complaining that he did not get pain

18  medications when he asked for them. DSUF ¶ 62. He became very angry and alleged staff was

19  trying to punish him. Id. The observing nurse apologized to plaintiff and offered him his pain

20  medications, but plaintiff refused to take them. Id.  Plaintiff's psychiatrist was apprised of the

21  situation and ordered plaintiff to return to five-point restraints because he was exhibiting self-

22  harming behavior. Id. At 3:00 a.m., plaintiff apologized for getting upset. Id. ¶ 63. His cell

23  temperature measured 73 degrees. Id. No noteworthy interactions occurred until around 6:00 a.m.

24  Id.

25       At 6:00 a.m., plaintiff was asked by a different staff member how he was doing and why

26  he was back in restraints. DSUF ¶ 64. Plaintiff did not saying anything but looked angrily at the

27  staff member. Id. He did not respond to questions, closed his eyes, and ignored staff. Id. His

28  circulation was checked and was normal. Id. Staff did not release plaintiff to check his range of

1  motion due to the unpredictability of his anger toward staff. Id.

2      At 7:20 a.m., the nurse's notes indicate that plaintiff was observed glaring menacingly at

3  them. DSUF ¶ 65. Plaintiff appeared to be sleeping from 8:00 a.m. until 11:00 a.m. Id. ¶ 66. At

4  11:00 a.m., plaintiff refused to answer when asked whether he was suicidal. Id. ¶ 67. He closed

5  his eyes and ignored staff. Id. At noon, plaintiff had his eyes closed, but was able to move from

6  side to side. DSUF ¶ 68. He was not forthcoming when asked about whether he was suicidal. Id.

7  He had an angry tone in his voice, was visibly angry, and claimed nurses were retaliating against

8  him. Id.

9      At 1:00 p.m., restraints were removed on each of plaintiff's four limbs, one at a time for

10 fifteen minutes each, so that staff could check his range of motion. DSUF ¶ 69. Plaintiff was

11 angry and complained that staff did not immediately respond to his pain. Id. He had a fierce look

12 in his eyes, was unpredictable, and had veins popping out of his neck when he was talking. Id.

13     Nurse Hu worked with plaintiff beginning at 2:20 p.m. on June 11, 2010; his cell

14 temperature measured 72 degrees at this time. DSUF ¶ 71. Nurse Hu observed plaintiff was lying

15 on his back and did not appear to be in distress. Id. His breathing was even and he did not

16 complain of pain or numbness. Id. Plaintiff had good circulation to each of his extremities. Id.

17 Plaintiff claims that Nurse Hu entered his cell, cursed at him, and was forced to leave by a

18 correctional officer. Pl.'s Resp. to DSUF ¶ 71.

19     At 3:20 p.m., plaintiff's cell temperature measured 72 degrees. DSUF ¶ 72. Nurse Hu

20 conducted range of motion exercises, and she observed that plaintiff did not appear to have any

21 objective injuries. Id. Plaintiff disputes this fact, claiming that he complained of numbness in his

22 extremities due to the tight restraints. Pl.'s Resp. to DSUF ¶ 72.

23     At 4:20 p.m., the nursing notes indicate that plaintiff accused Nurse Hu of wanting to hurt

24 him and/or wanting for him to commit suicide. DSUF ¶ 73. He also asked Nurse Hu to give him a

25 razor so that he can kill himself. Id. He did not appear to have any physical injuries. Id.

26     At 5:30 p.m., plaintiff was making excuses to have his restraints removed. DSUF ¶ 74.

27 When Nurse Hu removed the restraints for range of motion exercises, plaintiff was very resistant

28 to have them put back on. Id.

At 6:30 p.m., plaintiff was very upset and angry. DSUF ¶ 75. He accused Nurse Hu of saying he was sent to the gas chamber and asserted that he would file a grievance. Id. He was also very upset with Nurse Hu when she reapplied the restraints after checking the range of motion in his extremities. Id.

At 7:30 p.m., another nurse took over Nurse Hu's duties for checking on plaintiff. DSUF ¶ 76. This nurse's notes are lengthy, noting that plaintiff was unpredictable and angry; at no point in these notes is there a notation that plaintiff complained of restraints being placed too tightly. See id.

When Nurse Hu returned at 9:30 p.m., the cell temperature measured 73 degrees. DSUF ¶ 77. At 9:35 p.m., Nurse Hu was informed that plaintiff said he was going to get out of his restraints and hurt somebody. Id. ¶ 78. She documented this information. Id.

At 10:30 p.m., plaintiff complained of neck pain and was provided Tylenol. DSUF ¶ 79. He did not appear to have any injuries. Id. Nurse Hu's interactions with plaintiff then ended. Id.

During the period Nurse Hu observed plaintiff in restraints, he was monitored every fifteen minutes by Licensed Vocational Nurses, and checked on hourly by Nurse Hu. DSUF ¶ 80. His vital statistics were also checked every shift change. Id. Plaintiff's circulation and respiration was normal throughout the entire period in which he was restrained on June 11, 2010. Id.

It is Nurse Hu's custom and practice when applying restraints to allow three fingers to be placed between the inmate-patient and the restraints. DSUF ¶ 70. That way the inmate's circulation will not be restricted. Id. Plaintiff disputes this statement and claims that Nurse Hu repeatedly tightened the restraints on his limbs while cursing and threatening him. Pl.'s Resp. to DSUF ¶ 70.

Nurse Hu does not recall removing a fan from the plaintiff's cell door at any time. DSUF ¶ 43.

Plaintiff disputes many of the above facts relating to Nurse Hu. Instead, he claims that Nurse Hu repeatedly tightened plaintiff's restraints while cursing and threatening him; that a correctional officer witnessed this conduct and reported it to his supervisor; that this correctional

1   officer forced Nurse Hu to leave plaintiff's cell; and that this officer's report will be a "smoking

2   gun" in this case. Though plaintiff claims further discovery is necessary to locate the identity of

3   this correctional officer and his report, this request will be denied for the reasons discussed supra.

4   Plaintiff submits no other evidence in support of his claims.

5   **V.      Legal Standards**

6          Summary judgment is appropriate when the moving party "shows that there is no genuine

7   dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

8   Civ. P. 56(a).

9          Under summary judgment practice, "[t]he moving party initially bears the burden of

10   proving the absence of a genuine issue of material fact."  In re Oracle Corp. Sec. Litig., 627 F.3d

11   376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  The moving

12   party may accomplish this by "citing to particular parts of materials in the record, including

13   depositions, documents, electronically stored information, affidavits or declarations, stipulations

14   (including those made for purposes of the motion only), admission, interrogatory answers, or

15   other materials" or by showing that such materials "do not establish the absence or presence of a

16   genuine dispute, or that the adverse party cannot produce admissible evidence to support the

17   fact." Fed. R. Civ. P. 56(c)(1).  "Where the non-moving party bears the burden of proof at trial,

18   the moving party need only prove that there is an absence of evidence to support the non-moving

19   party's case." Oracle Corp., 627 F.3d at 387 (citing Celotex, 477 U.S. at 325); see also Fed. R.

20   Civ. P. 56(c)(1)(B).  Indeed, summary judgment should be entered, "after adequate time for

21   discovery and upon motion, against a party who fails to make a showing sufficient to establish the

22   existence of an element essential to that party's case, and on which that party will bear the burden

23   of proof at trial." Celotex, 477 U.S. at 322.  "[A] complete failure of proof concerning an

24   essential element of the nonmoving party's case necessarily renders all other facts immaterial."

25   Id. at 323.  Summary judgment should be granted, "so long as whatever is before the district court

26   demonstrates that the standard for entry of summary judgment . . . is satisfied."  Id. at 323.

27          If the moving party meets its initial responsibility, the burden then shifts to the opposing

28   party to establish that a genuine issue as to any material fact actually does exist.  Matsushita Elec.

14

1   Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).  In attempting to establish the

2   existence of this factual dispute, the opposing party may not rely upon the allegations or denials

3   of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or

4   admissible discovery material, in support of its contention that the dispute exists.  Fed. R. Civ. P.

5   56(c)(1); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in

6   contention is material, i.e., a fact "that might affect the outcome of the suit under the governing

7   law," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific

8   Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e.,

9   "the evidence is such that a reasonable jury could return a verdict for the nonmoving party,"

10   Anderson, 447 U.S. at 248.

11        In the endeavor to establish the existence of a factual dispute, the opposing party need not

12   establish a material issue of fact conclusively in its favor.  It is sufficient that "'the claimed

13   factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the

14   truth at trial.'"  T.W. Elec. Serv., 809 F.2d at 630 (quoting First Nat'l Bank v. Cities Serv. Co.,

15   391 U.S. 253, 288-89 (1968).  Thus, the "purpose of summary judgment is to pierce the pleadings

16   and to assess the proof in order to see whether there is a genuine need for trial."  Matsushita, 475

17   U.S. at 587 (citation and internal quotation marks omitted).

18        "In evaluating the evidence to determine whether there is a genuine issue of fact, [the

19   court] draw[s] all inferences supported by the evidence in favor of the non-moving party."  Walls

20   v. Central Contra Costa Transit Auth., 653 F.3d 963, 966 (9th Cir. 2011) (citation omitted).  It is

21   the opposing party's obligation to produce a factual predicate from which the inference may be

22   drawn.  Richards v. Nielsen Freight Lines, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to

23   demonstrate a genuine issue, the opposing party "must do more than simply show that there is

24   some metaphysical doubt as to the material facts."  Matsushita, 475 U.S. at 586 (citations

25   omitted).  "Where the record taken as a whole could not lead a rational trier of fact to find for the

26   non-moving party, there is no 'genuine issue for trial.'"  Id. at 587 (quoting First Nat'l Bank, 391

27   U.S. at 289).

28   ////]=

1  **VI.    Discussion**

2          **A.    Nurse Gebrezghi**

3          Plaintiff's claim against Nurse Gebrezghi is premised on her administration of two

4  intramuscular injections on June 4, 2010. Plaintiff contends this was deliberately indifferent to his

5  medical needs.

6          Deliberate indifference to a prisoner's serious illness or injury, or risks of serious injury or

7  illness, gives rise to a claim under the Eighth Amendment. See Estelle v. Gamble, 429 U.S. 97,

8  105 (1976); see also Farmer v. Brennan, 511 U.S. 825, 837 (1994). This applies to physical as

9  well as dental and mental health needs. See Hoptowit v. Ray, 682 F.2d 1237, 1253 (9th Cir.

10  1982). An injury or illness is sufficiently serious if the failure to treat a prisoner's condition could

11  result in further significant injury or the "...unnecessary and wanton infliction of pain." McGuckin

12  v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992); see also Doty v. County of Lassen, 37 F.3d 540,

13  546 (9th Cir. 1994). Factors indicating seriousness are: (1) whether a reasonable doctor would

14  think that the condition is worthy of comment; (2) whether the condition significantly impacts the

15  prisoner's daily activities; and (3) whether the condition is chronic and accompanied by

16  substantial pain. See Lopez v. Smith, 203 F.3d 1122, 1131-32 (9th Cir. 2000) (en banc).

17          The requirement of deliberate indifference is less stringent in medical needs cases than in

18  other Eighth Amendment contexts because the responsibility to provide inmates with medical

19  care does not generally conflict with competing penological concerns. See McGuckin, 974 F.2d at

20  1060. Thus, deference need not be given to the judgment of prison officials as to decisions

21  concerning medical needs. See Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir. 1989). The

22  complete denial of medical attention may constitute deliberate indifference. See Toussaint v.

23  McCarthy, 801 F.2d 1080, 1111 (9th Cir. 1986).

24          Construing the facts in plaintiff's favor, as the court must, the evidence establishes that

25  Nurse Gebrezghi administered two intramuscular injections at the direction of Dr. Kumar and

26  over plaintiff's objections. Dr. Kumar submits that administering the medication in this manner

27  was reasonable and clinically indicated under the circumstances, which were extensively

28  documented at the time and included plaintiff's attempt to self-harm, his loud and argumentative

16

1   behavior, his threats to nursing staff, and the physical manifestations of his anger (veins popping

2   out of his neck and arms). While the injections were administered over plaintiff's objections,

3   which will be assumed to have caused psychological harm, there is simply no evidence that Nurse

4   Gebrezghi acted with a sufficiently culpable state of mind. Based on this evidence, the

5   undersigned concludes that no reasonable trier of fact would find that Nurse Gebrezghi violated

6   plaintiff's Eighth Amendment right to be free from excessive force.

7       Insofar as plaintiff's claim can construed as one involving the involuntary administration

8   of medication, inmates have a substantial liberty interest, grounded in the Due Process Clause, in

9   avoiding the involuntary administration of antipsychotic medication. See Washington v. Harper,

10  494 U.S. 210, 221-22 (1990) (holding that prisoners possess "a significant liberty interest in

11  avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the

12  Fourteenth Amendment"). "[T]he Due Process Clause permits the State to treat a prison inmate

13  who has a serious mental illness with antipsychotic drugs against his will, if the inmate is

14  dangerous to himself or others and the treatment is in the inmate's medical interest." Id. at 227.

15  As noted, the evidence here demonstrates that plaintiff was both a danger to himself and to others.

16  Notably, plaintiff admits that he did not oppose the medication per se, only its intramuscular

17  administration. Fed. R. Civ. P. 56(f)(2).

18      And finally, to the extent plaintiff claims that Nurse Gebrezghi injected him in retaliation

19  for his threats against the nurses, he submits no evidence that she was present during or otherwise

20  aware of these threats, that her conduct was motivated by anything other than an order from Dr.

21  Kumar, or that the injections did not advance a legitimate correctional goal of subduing plaintiff

22  under the circumstances presented. See Rhodes v. Robinson, 408 F.3d 559, 567-68 (9th Cir.

23  2005) ("Within the prison context, a viable claim of First Amendment retaliation entails five basic

24  elements: (1) An assertion that a state actor took some adverse action against an inmate (2)

25  because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's

26  exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate

27  correctional goal.")

28      For these reasons, summary judgment should be entered for this defendant.

1

   **B.     Nurse Hu**

2          Plaintiff's claim against Nurse Hu is premised on her alleged removal of a fan from under

3   plaintiff's door on June 9, 2010, with malicious intent. This caused plaintiff's nose to bleed and

4   him to suffer under harsh conditions for twenty-four hours before another fan was placed in front

5   of his cell.

6          "The Eighth Amendment's prohibition against cruel and unusual punishment protects

7   prisoners not only from inhumane methods of punishment but also from inhumane conditions of

8   confinement." Morgan v. Morgensen, 465 F.3d 1041, 1045 (9th Cir. 2006) (citing Farmer, 511

9   U.S. at 847, and Rhodes v. Chapman, 452 U.S. 337, 347 (1981)). Although conditions of

10  confinement may be, and often are, restrictive and harsh, they "must not involve the wanton and

11  unnecessary infliction of pain." Rhodes, 452 U.S. at 347.

12          An Eighth Amendment claim challenging conditions of confinement must satisfy both

13  objective and subjective criteria. Wilson v. Seiter, 501 U.S. 294, 298 (1991). First, the deprivation

14  must be sufficiently serious to implicate the Constitution. Id. The conditions of a prisoner's

15  confinement amount to cruel and unusual punishment only if he has been deprived of the

16  "minimal civilized measure of life's necessities." Rhodes, 452 U.S. at 347. Second, prison

17  officials are liable for the deprivation only if they acted with deliberate indifference to a

18  substantial risk of serious harm. Farmer, 511 U.S. at 828. The official must know of and disregard

19  an excessive risk to inmate health or safety; she must have been aware of facts from which the

20  inference could be drawn that a substantial risk of serious harm existed, and must actually have

21  drawn the inference. Id. at 837.

22          Nurse Hu is entitled to summary judgment on this claim because plaintiff has not satisfied

23  the objective element of his Eighth Amendment conditions of confinement claim. Setting aside

24  the fact that the nursing notes demonstrate that Nurse Hu's first interaction with plaintiff occurred

25  on June 11, 2010, two days after plaintiff claims she removed the fan, the records reveal that

26  plaintiff's cell temperature never rose over 75-degrees even in the absence of a fan and air

27  conditioning. This moderate temperature does not support plaintiff's claim that he suffered under

28  "extremely harsh conditions" as a result of Nurse Hu's conduct. Even if plaintiff can establish

deliberate indifference, his placement in a cell for 24 hours with a temperature never exceeding 75 degrees is not, objectively speaking, sufficiently serious to implicate the Constitution. Only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation. Hudson v. McMillian, 503 U.S. 1, 9 (1992) (citations and quotations omitted); see also Graves v. Arpaio, 623 F.3d 1043, 1049 (9th Cir. 2010) (per curiam) (noting the Eighth Amendment requires adequate heating, but not necessarily a "comfortable" temperature). Summary judgment should therefore be entered for Nurse Hu.

Plaintiff's excessive force claim against Nurse Hu is premised on the latter's placement of a tight restraint on plaintiff's hand on June 11, 2010, and her refusal to loosen it after plaintiff complained. When determining whether the force was excessive, the court looks to the "extent of the injury suffered by an inmate . . . , the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.'" Hudson, 503 U.S. at 7 (citing Whitley, 475 U.S. at 321). While de minimis uses of physical force generally do not implicate the Eighth Amendment, significant injury need not be evident in the context of an excessive force claim, because "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." Hudson, 503 U.S. at 9 (citing Whitley, 475 U.S. at 327).

The extent of injury suffered by the plaintiff may indicate the amount of force applied. Wilkins v. Gaddy, 559 U.S. 34, 37 (2010). "[N]ot 'every malevolent touch by a prison guard gives rise to a federal cause of action.'" Id. (quoting Hudson, 503 U.S. at 9).

> The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind. An inmate who complains of a 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim. Injury and force, however, are only imperfectly correlated, and it is the latter that ultimately counts."

1   Wilkins, 559 U.S. at 37-38 (internal citations and some internal quotation marks omitted).

2          Nurse Hu denies having placed the restraints too tightly and asserts that it is her practice

3   to allow three fingers to be placed between the inmate-patient and the restraints so that circulation

4   will not be restricted. Assuming arguendo that Nurse Hu did place the restraints on plaintiff

5   tightly, there is no evidence of plaintiff's complaints of pain or injury to Nurse Hu or any other

6   staff member. There is also no evidence of any physical injury to plaintiff, such as bruising,

7   swelling or abrasion. Instead, the evidence demonstrates that plaintiff repeatedly frustrated

8   nursing staff's efforts to place the restraints on him, both before and after Nurse Hu's shift; that

9   he was combative, uncooperative, unpredictable, threatening, and violent; and that numerous

10  times the range of motion exercises were not performed by Nurse Hu or other nursing staff

11  because of plaintiff's conduct. There is also evidence from defendants' expert, who opines that

12  plaintiff's complaints can be attributed to his borderline personality disorder because individuals

13  exhibiting that condition believe others do not care about them enough or even want to punish

14  them. DSUF ¶ 81. On the facts presented then, the undersigned concludes that no reasonable trier

15  of fact would find that the force applied by Nurse Hu was anything more than de minimis and of

16  minimal duration. Thus, summary judgment should be entered for Nurse Hu.

17         Based on the foregoing, the undersigned will recommend that defendants' motion for

18  summary judgment granted. In light of this recommendation, the court declines to consider

19  defendants' alternate argument that they are entitled to qualified immunity.

20  **IV.    Conclusion**

21         Accordingly, IT IS HEREBY ORDERED that plaintiff's request to continue (ECF No.

22  56) is DENIED; and

23         IT IS HEREBY RECOMMENDED that defendants' motion for summary judgment be

24  granted and this action be dismissed.

25         These findings and recommendations are submitted to the United States District Judge

26  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

27  after being served with these findings and recommendations, any party may file written

28  objections with the court and serve a copy on all parties.  Such a document should be captioned

1   "Objections to Magistrate Judge's Findings and Recommendations."

2        Any reply to the objections shall be served and filed within fourteen days after service of

3   the objections.  Failure to file objections within the specified time may waive the right to appeal

4   the District Court's order.  <u>Turner v. Duncan</u>, 158 F.3d 449, 455 (9th Cir. 1998); <u>Martinez v. Ylst</u>,

5   951 F.2d 1153 (9th Cir. 1991).

6   Dated:  December 23, 2016

7

8   _____

9   DEBORAH BARNES
    UNITED STATES MAGISTRATE JUDGE

10

11  /DLB7
    DB/Inbox/Substantive/mcmu0103.msj

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28